1

2

3

4

5                      IN THE UNITED STATES DISTRICT COURT

6

7                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9   LG ELECTRONICS, INC.,                      No. C 07-6511 CW

10          Plaintiff and
            Counterclaim Defendant,
11
       v.                                      ORDER GRANTING
                                               DEFENDANTS' MOTION
12                                             FOR PARTIAL SUMMARY
    HITACHI, LTD.; HITACHI AMERICA, LTD;       JUDGMENT
13  HITACHI DATA SYSTEMS CORPORATION; and
    HITACHI COMPUTER PRODUCTS (AMERICA),
14  INC.,

15          Defendants and
            Counterclaimants.
16
    _____/
17

18

19       Defendants Hitachi, Ltd., Hitachi America, Ltd., Hitachi Data

20  Systems Corp. and Hitachi Computer Products (America), Inc.

21  (collectively, Hitachi), move for partial summary judgment on

22  Plaintiff LG Electronics, Inc.'s (LGE) infringement claims with

23  respect to a subset of the accused products.  LGE opposes the

24  motion.  The matter was heard on February 26, 2009.  Having

25  considered oral argument and all of the papers submitted by the

26  parties, the Court grants Hitachi's motion.

27

28

BACKGROUND

LGE charges Hitachi with infringing four of its patents: U.S. Patent Nos. 4,939,641, 5,379,379, 5,077,733 and 4,918,645.  The same patents were the subject of litigation in this Court between LGE and a number of computer manufacturers.  That litigation was eventually appealed to the United States Supreme Court.  The Supreme Court described the technology embodied in the first three of the patents as follows:

> The data processed by the computer are stored principally in random access memory, also called main memory. Frequently accessed data are generally stored in cache memory, which permits faster access than main memory and is often located on the microprocessor itself.  When copies of data are stored in both the cache and main memory, problems may arise when one copy is changed but the other still contains the original "stale" version of the data.  The '641 patent addresses this problem. It discloses a system for ensuring that the most current data are retrieved from main memory by monitoring data requests and updating main memory from the cache when stale data are requested.
>
> The '379 patent relates to the coordination of requests to read from, and write to, main memory.  Processing these requests in chronological order can slow down a system because read requests are faster to execute than write requests.  Processing all read requests first ensures speedy access, but may result in the retrieval of outdated data if a read request for a certain piece of data is processed before an outstanding write request for the same data.  The '379 patent discloses an efficient method of organizing read and write requests while maintaining accuracy by allowing the computer to execute only read requests until it needs data for which there is an outstanding write request.  Upon receiving such a read request, the computer executes pending write requests first and only then returns to the read requests so that the most up-to-date data are retrieved.
>
> The '733 patent addresses the problem of managing the data traffic on a bus connecting two computer components, so that no one device monopolizes the bus.  It allows multiple devices to share the bus, giving heavy users greater access.  This patent describes methods that establish a rotating priority system under which each

2

> device alternately has priority access to the bus for a
> preset number of cycles and heavier users can maintain
> priority for more cycles without "hogging" the device
> indefinitely.

Quanta Computer, Inc. v. LG Elecs., Inc., ___ U.S. ___, 128 S. Ct.

2109, 2113-14 (2008) (citations omitted).

Although the '645 patent was the subject of proceedings in

this Court and in the Federal Circuit on appeal, LGE did not pursue

its infringement contentions with respect to the '645 patent in the

Supreme Court.  In its decision, the Federal Circuit described the

technology embodied in that patent as follows:

> The '645 patent discloses a digital computer system that
> has devices called agents that are interconnected by a
> system bus.  The claimed system and corresponding method
> require one agent, the requesting agent, to request
> access to a memory stored on another agent, called the
> replying agent.  The requested data is organized as a
> matrix of memory cells, having column and row
> coordinates.  The "memory controller" of the replying
> agent processes the request from the requesting agent by
> asserting a plurality of memory address control signals,
> including at least one row address strobe ("RAS") signal
> and one column address strobe ("CAS") signal.  This "page
> mode memory access" operates by the assertion of an
> entire row of data followed by the assertion and
> deassertion of multiple column addresses.  By the RAS
> signal accessing an entire row followed by the assertion
> and deassertion of particular column addresses, this page
> mode memory access differs from the conventional memory
> access, which separately accessed each memory cell by
> asserting its individual row address and column address.
> In the claimed invention, after the data is accessed, it
> is then transferred to the requesting agent over the
> system bus.

LG Elecs., Inc. v. Bizcom Elecs., Inc. (Bizcom), 453 F.3d 1364,

1373 (Fed. Cir. 2006).

On September 7, 2000, LGE entered into a license agreement

with Intel Corporation.  Pursuant to this agreement, Intel paid to

LGE a certain sum of money and agreed to provide an additional

3

amount in discounts on future purchases.  It also gave LGE a

license to its own patents.  In exchange, Intel received a "fully

paid-up, worldwide license" to the technology in LGE's patents,

including the four patents at issue here.  The same license

agreement was involved in the <u>Quanta</u> litigation.  The Supreme Court

described the relevant provisions of the agreement as follows:

> The License Agreement authorizes Intel to "make, use,
> sell (directly or indirectly), offer to sell, import or
> otherwise dispose of" its own products practicing the LGE
> Patents.  Notwithstanding this broad language, the
> License Agreement contains some limitations.  Relevant
> here, it stipulates that no license "is granted by either
> party hereto . . . to any third party for the combination
> by a third party of Licensed Products of either party
> with items, components, or the like acquired . . . from
> sources other than a party hereto, or for the use,
> import, offer for sale or sale of such combination."  The
> License Agreement purports not to alter the usual rules
> of patent exhaustion, however, providing that,
> "[n]otwithstanding anything to the contrary contained in
> this Agreement, the parties agree that nothing herein
> shall in any way limit or alter the effect of patent
> exhaustion that would otherwise apply when a party hereto
> sells any of its Licensed Products."
>
> In a separate agreement (Master Agreement), Intel agreed
> to give written notice to its own customers informing
> them that, while it had obtained a broad license
> "ensur[ing] that any Intel product that you purchase is
> licensed by LGE and thus does not infringe any patent
> held by LGE," the license "does not extend, expressly or
> by implication, to any product that you make by combining
> an Intel product with any non-Intel product."  The Master
> Agreement also provides that "a breach of this Agreement
> shall have no effect on and shall not be grounds for
> termination of the Patent License."

<u>Quanta</u>, 128 S. Ct. at 2114.

The defendant computer manufacturers in <u>Quanta</u> had purchased

microprocessors and chipsets from Intel and received the notice

required by the Master Agreement.  They then "manufactured

computers using Intel parts in combination with non-Intel memory

United States District Court
For the Northern District of California

and buses in ways that practice the LGE Patents," but did not modify the Intel parts in the course of doing so. <u>Id.</u> LGE brought suit, accusing the manufacturers of infringing its patents. The defendants asserted that LGE could not sue for infringement because it had exhausted its rights to enforce the patents by licensing the patented methods to Intel.

LGE argued to the Supreme Court that:

[B]ecause method patents are linked not to a tangible article but to a process, they can never be exhausted through a sale. Rather, practicing the patent -- which occurs upon each use of an article embodying a method patent -- is permissible only to the extent rights are transferred in an assignment contract.

<u>Id.</u> at 2117. The Court rejected this argument, reasoning that "[e]liminating exhaustion for method patents would seriously undermine the exhaustion doctrine" because any apparatus claim could be re-cast as a method claim and, "[b]y characterizing their claims as method instead of apparatus claims, or including a method claim for the machine's patented method of performing its task, a patent drafter could shield practically any patented item from exhaustion." <u>Id.</u> at 2117-18. The Court reiterated its previous holding that "the traditional bar on patent restrictions following the sale of an item applies when the item sufficiently embodies the patent -- even if it does not completely practice the patent -- such that its only and intended use is to be finished under the terms of the patent." <u>Id.</u> at 2117 (following <u>United States v. Univis Lens Co.</u>, 316 U.S. 241 (1942).

The Court concluded:

The authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and

5

> prevents the patent holder from invoking patent law to control postsale use of the article.  Here, LGE licensed Intel to practice any of its patents and to sell products practicing those patents.  Intel's microprocessors and chipsets substantially embodied the LGE Patents because they had no reasonable noninfringing use and included all the inventive aspects of the patented methods.  Nothing in the License Agreement limited Intel's ability to sell its products practicing the LGE Patents.  Intel's authorized sale to Quanta thus took its products outside the scope of the patent monopoly, and as a result, LGE can no longer assert its patent rights against Quanta.

Id. at 2122.

LGE now charges Hitachi with infringing the patents-in-suit in the same way that it alleged the defendants in Quanta infringed those patents: by combining in its products Intel parts that are subject to the license agreement with non-Intel parts in a way that practices the methods taught in the patents.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if it is supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought.

6

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible

United States District Court
For the Northern District of California

discovery material, to show that the dispute exists." <u>Bhan</u>, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. <u>Nissan</u>, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. <u>Id.</u>

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. <u>Id.</u> This is true even though the non-moving party bears the ultimate burden of persuasion at trial. <u>Id.</u> at 1107.

DISCUSSION

Although the present case is similar to <u>Quanta</u> in many respects, LGE argues that <u>Quanta</u> is distinguishable. In particular, it argues that the Intel parts at issue here do not substantially embody the patents-in-suit as did the Intel parts that the Supreme Court considered in <u>Quanta</u>. It also argues that, even if the parts do substantially embody the patents, <u>Quanta</u>'s holding regarding exhaustion applies only when the first authorized sale of patented items occurs in the United States. Hitachi disputes both of these points, and also contends that, even if <u>Quanta</u> does not apply to foreign sales, the relevant sales here took place in the United States.

I.   Substantial Embodiment

As noted above, the Supreme Court's decision in <u>Quanta</u>

8

provides that the authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights.  Because exhaustion is an affirmative defense, Hitachi bears the burden on this motion of demonstrating that the Intel parts substantially embody the patents-at-issue and that there is no evidence by which a reasonable juror could conclude otherwise.  LGE argues that Hitachi has not met this burden.

First, Hitachi asserts that LGE is collaterally estopped from arguing that the Intel parts do not substantially embody its patents.  However, in order for collateral estoppel to apply,

> (1) the issue at stake must be identical to the one
> alleged in the prior litigation; (2) the issue must have
> been actually litigated by the party against whom
> preclusion is asserted in the prior litigation; and
> (3) the determination of the issue in the prior
> litigation must have been a critical and necessary part
> of the judgment in the earlier action.

Trevino v. Gates, 99 F.3d 911, 926 (9th Cir. 1996) (quoting Town of North Bonneville v. Callaway, 10 F.3d 1505, 1508 (9th Cir. 1993)).  As LGE notes, the Intel components in this case are not the same components that were the subject of the Quanta litigation, nor was the issue of whether any Intel parts substantially embody the '645 patent before the Supreme Court.  Thus, the substantial embodiment issue here is not identical to the substantial embodiment issue in Quanta, and LGE is not estopped from arguing that the parts at issue here do not substantially embody the patents-in-suit.

Notwithstanding the unavailability of collateral estoppel, the Supreme Court's discussion of substantial embodiment in Quanta speaks directly to the issues presented in this case.  Quanta held that exhaustion is triggered by the sale of products that embody

United States District Court
For the Northern District of California

9

"essential features of the patented invention" and whose "only reasonable and intended use [is] to practice the patent."  128 S. Ct. at 2119.  There, exhaustion was triggered because "[e]verything inventive about each patent [was] embodied in the Intel Products" and "the only step necessary to practice the patent [was] the application of common processes or the addition of standard parts." 128 S. Ct. at 2120.

LGE's preliminary infringement contentions demonstrate that here, as in <u>Quanta</u>, the Intel parts substantially embody the patents-in-suit.  According to those contentions, the fact that the Hitachi products contain Intel components in combination with other standard components is sufficient to demonstrate infringement.  The contentions do not premise infringement on "any creative or inventive decision" on Hitachi's part when it determined how to combine the various components, nor do they allege that any non-Intel component necessary fully to practice the patents-in-suit was anything other than a standard part.

LGE points to four "exemplary inventive aspects" of the patents-in-suit that are not practiced by the licensed Intel parts. However, none of these examples survives scrutiny because in each case, LGE's argument amounts to saying that, because a non-Intel component performs a role that is necessary to the proper functioning of the patented system, the Intel components do not substantially embody the patent.  This is exactly the reasoning the Supreme Court rejected in <u>Quanta</u>.  The mere fact that a component is <u>necessary</u> to practice the patent does not mean that it reflects an <u>inventive aspect</u> of the patent -- it must also be a unique

**United States District Court**
For the Northern District of California

feature of the patented system.

First, LGE maintains that one inventive aspect of the '645 patent is embodied by non-Intel memory -- as opposed to the licensed Intel memory controller -- because the patent involves "providing page mode access to memory over a system bus in response to a request from a requesting agent." Pl.'s Opp. at 9. It is true that one inventive aspect of the '645 patent is the provision of page mode access to memory, but this is accomplished by the memory <u>controller</u> that is the subject of the patented claims, not the memory itself. In order for certain limitations of the asserted claims to be satisfied, the memory controller obviously must be connected to memory. But Hitachi's infringement contentions do not suggest that infringement depends on the connection of something other than a standard memory chip.

Second, with respect to the '641 patent, LGE asserts that a proprietary Hitachi chipset "is an essential component in providing communications between the claimed 'central processing units' and 'main memory means,'" and therefore is "integral to maintaining cache coherency as recited in the '641 patent claims." <u>Id.</u> at 10. But the observation that it is important to have accurate communication between the central processing unit and main memory is not remarkable and does not render the mode of communication an inventive aspect of the patent. The fact that the communication is accomplished by a proprietary (and, by implication, non-"standard") chipset does not necessarily mean that the chipset itself embodies an inventive aspect of the '641 patent. In fact, LGE's infringement contentions do not depend on the unique nature of the

11

United States District Court
For the Northern District of California

communication between the central processing unit and main memory
provided by the proprietary chipset; they only depend on the fact
that such communication exists.

Third, LGE notes that one claim of the '733 patent requires
"counting a number of accesses by the device to the bus; and in
response to a predetermined number of accesses to the bus, giving
another node the highest priority." Id. at 11. LGE asserts that
the Intel components do not embody the patent because non-Intel
components perform the step of counting the number of accesses by a
particular device to the bus. The inventive aspect of the patent,
however, is not its method of counting accesses, but rather its
method of determining priority after the number of accesses has
been determined. As stressed by the Supreme Court in Quanta, the
mere fact that certain limitations of the claim are satisfied by
non-Intel components does not mean that the Intel components do not
embody the patent. Similarly, although some claims of the patent
require an initial step of "providing a value indicating a
predetermined number of accesses that a device may make to the
bus," id. at 12 -- a step that occurs when registers for latency
timers are configured by the accused product's BIOS or operating
systems -- the inventive aspect of the '733 patent is not defining
the access limit, but rather using the predefined limit to
establish a priority system.

Fourth, LGE contends that the licensed Intel memory controller
chipset does not substantially embody the '379 patent because it
"depends on software and the ultimate configuration of that
software as part of its structure." Id. at 12-13. LGE makes the

12

same argument more generally with respect the other three patents-in-suit.  The fact that the Intel components rely on software to "be configured in a specific way depending on the design of Hitachi's products," however, does not mean that the software is an inventive aspect of the patents.  The Intel products at issue in the <u>Quanta</u> litigation also required configuration by software, and yet the Supreme Court held that the products substantially embodied the patents-in-suit.

LGE objects to the use of its preliminary infringement contentions to resolve the substantial embodiment issue.  There appear to be two aspects to this argument.  First, LGE apparently asserts that, because its contentions are not "facts," they are not properly considered on a summary judgment motion.  But LGE is bound by its contentions, and those contentions assert that the accused products infringe the patents-in-suit based on nothing more than the fact that they contain licensed Intel parts in combination with other unspecified standard parts.  This establishes that, according to LGE's own theory of infringement, the parts substantially embody the patents, and LGE cannot claim otherwise.  Moreover, it is not clear what "facts" LGE proposes Hitachi should be required to introduce in support of the present motion.  The substantial embodiment issue is intimately connected with the question of whether and in what manner the Intel parts infringe.  The only way Hitachi can demonstrate that the Intel parts substantially embody the patents is by relying on LGE's infringement contentions. Second, LGE objects to reliance on its <u>preliminary</u> infringement contentions (as opposed to its final infringement contentions) to

United States District Court
For the Northern District of California

establish the absence of a triable issue of fact.  But the contentions are only preliminary in the sense that they may be amended if information unearthed during discovery so warrants.  LGE may not litigate infringement claims based solely on a theory that is barred by patent exhaustion in the hope that discovery may potentially enable it to come up with new infringement theories that are not similarly barred.

II.  Foreign Sales

LGE argues that, although sales in the United States of products substantially embodying a method patent serve to exhaust the patent holder's rights, foreign sales do not.  It is true that the Supreme Court did not specifically state in <u>Quanta</u> that its holding applied to foreign sales.  However, the Court was unequivocal in stating that the "authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article."  128 S. Ct. at 2122.  It is undisputed that Intel's foreign sales to Hitachi were specifically authorized by the worldwide license agreement, and thus these sales fall squarely within the ambit of <u>Quanta</u>.  Moreover, the Supreme Court's rationale for its decision supports the conclusion that it meant "authorized sales" to include "authorized foreign sales."  In rejecting LGE's argument that method claims, as a category, are never exhaustible, the Court stated:

> This case illustrates the danger of allowing such an end-run around exhaustion.  On LGE's theory, although Intel is authorized to sell a completed computer system that practices the LGE Patents, any downstream purchasers of the system could nonetheless be liable for patent

United States District Court

For the Northern District of California

14

infringement.  Such a result would violate the longstanding principle that, when a patented item is once lawfully made and sold, there is no restriction on its use to be implied for the benefit of the patentee.

Id. at 2118 (internal quotation marks omitted).  Accepting LGE's argument that authorized foreign sales do not exhaust a patentee's rights would permit the type of "end-run around exhaustion" disapproved in Quanta, because "any downstream purchasers" of an Hitachi product could be liable for infringement even though the product had been "once lawfully made and sold" pursuant to the license agreement between LGE and Intel.

In addition, the Supreme Court in Quanta was aware that some sales under the license agreement were made overseas: In considering whether the Intel parts had reasonable non-infringing uses, which was relevant to the question of whether they substantially embodied the patents-in-suit, the Court stated in a footnote:

> LGE suggests that the Intel Products would not infringe its patents if they were sold overseas, used as replacement parts, or engineered so that use with non-Intel Products would disable their patented features. But Univis teaches that the question is whether the product is "capable of use only in practicing the patent," not whether those uses are infringing.  Whether outside the country or functioning as replacement parts, the Intel Products would still be practicing the patent, even if not infringing it.  And since the features partially practicing the patent are what must have an alternative use, suggesting that they be disabled is no solution.  The disabled features would have no real use.

Id. at 2119 n.6 (citations omitted) (emphasis in original). Although this discussion relates to the "substantial embodiment" issue, not the "authorized sale" issue, the fact that the Court was aware of foreign sales of the Intel parts, yet declined to limit

15

its holding to sales in the United States, suggests that interpreting Quanta so as to impose such a limitation would be incorrect.

As LGE notes, the Federal Circuit has previously held that foreign sales of products covered by a United States patent do not serve to exhaust the patent holder's rights with respect to those products. The first case to address this issue was Jazz Photo Corp. v. International Trade Commission, 264 F.3d 1094 (Fed. Cir. 2001). That case involved Jazz Photo's importation of refurbished single-use cameras, also known as lens-fitted film packages (LFFP's), covered by United States patents owned by Fuji Photo Film Co. The primary issue was whether the refurbishment constituted repair (which is permitted under the patent laws) or reconstruction (which is not). The court noted that the dichotomy between repair and reconstruction is based on the principle of exhaustion: Once a product is lawfully sold, the purchaser obtains the right to repair it. Because of the doctrine of patent exhaustion, this right inures to all subsequent purchasers. Reconstruction, however, amounts to a "second creation" that exceeds the rights that accompanied the initial sale. Thus, neither the first purchaser nor subsequent purchasers may invoke exhaustion to defend against a charge of infringement based on reconstruction of a patented product. In this context, the court addressed whether Jazz Photo could invoke the repair defense with respect to LFFP's that were originally sold overseas:

> Fuji states that some of the imported LFFP cameras
> originated and were sold only overseas, but are included
> in the refurbished importations by some of the

16

United States District Court
For the Northern District of California

1  respondents. . . . United States patent rights are not
2  exhausted by products of foreign provenance.  To invoke
   the protection of the first sale doctrine, the authorized
   first sale must have occurred under the United States
3  patent.  See Boesch v. Graff, 133 U.S. 697, 701-703
   (1890) (a lawful foreign purchase does not obviate the
4  need for license from the United States patentee before
   importation into and sale in the United States).  Our
5  decision applies only to LFFPs for which the United
   States patent right has been exhausted by first sale in
6  the United States.  Imported LFFPs of solely foreign
   provenance are not immunized from infringement of United
7  States patents by the nature of their refurbishment.

8  Jazz Photo, 264 F.3d at 1105.

9      In Fuji Photo Film Co., LTD v. Jazz Photo Corp., 394 F.3d 1368

10 (Fed. Cir. 2005), the Federal Circuit elaborated on its reasoning

11 in Jazz Photo:

12     This court does not construe the "solely foreign
       provenance" language [in Jazz Photo] or the Boesch
13     citation to dictate a narrow application of the
       exhaustion principle.  Specifically, this court does not
14     read Boesch or the above language to limit the exhaustion
       principle to unauthorized sales.  Jazz therefore does not
15     escape application of the exhaustion principle because
       Fuji or its licensees authorized the international first
16     sales of these LFFPs.  The patentee's authorization of an
       international first sale does not affect exhaustion of
17     that patentee's rights in the United States.  Moreover,
       the "solely foreign provenance" language does not negate
18     the exhaustion doctrine when either the patentee or its
       licensee sells the patented article abroad.
19
       Read in full context, this court in Jazz stated that only
20     LFFPs sold within the United States under a United States
       patent qualify for the repair defense under the
21     exhaustion doctrine.  Moreover, Fuji's foreign sales can
       never occur under a United States patent because the
22     United States patent system does not provide for
       extraterritorial effect.  Int'l Rectifier Corp. v.
23     Samsung Elecs. Co., 361 F.3d 1355, 1360 (Fed. Cir. 2004)
       ("Further, it is well known that United States patent
24     laws 'do not, and were not intended to, operate beyond
       the limits of the United States,'" quoting Brown v.
25     Duchesne, 60 U.S. 183, 195 (1856)).  In Jazz, therefore,
       this court expressly limited first sales under the
26     exhaustion doctrine to those occurring within the United
       States.
27

28                              17

*Fuji Photo*, 394 F.3d at 1368 (additional citation omitted).

Although *Fuji Photo*'s holding would foreclose granting summary judgment against LGE with respect to accused products containing Intel products that were first sold abroad, such a result would be inconsistent with *Quanta*. Drawing such a distinction between authorized domestic sales and authorized foreign sales would negate the Supreme Court's stated intent in *Quanta* to eliminate the possibility of a patent holder doing an "end-run" around the exhaustion doctrine by authorizing a sale, thereby reaping the benefit of its patent, then suing a downstream purchaser for patent infringement. District courts may not follow circuit court precedent where a subsequent Supreme Court decision has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003). This is such an instance.

Furthermore, *Boesch*, the Supreme Court case upon which the Federal Circuit relied in *Jazz Photo* in concluding that an authorized sale "must have occurred under [a] United States patent," does not conflict with this Court's holding that the foreign sale of a product licensed under a United States patent exhausts the patent holder's rights. The plaintiffs in *Boesch* held patents for the same invention in both the United States and Germany. The defendants purchased the patented device in Germany from a person who had the right to sell it under German law because he "had made preparations to manufacture the [device] prior to the application for the German patent." 133 U.S. at 701. The Supreme Court held that, because the German purchase was made "without the

18

United States District Court
For the Northern District of California

license or consent of the owners of the United States patent," the defendants were not permitted to sell the invention in the United States.  Id. at 701.  In other words, the unauthorized foreign sale of the device did not exhaust the United States patent holder's rights to enforce the patent with respect to sales in the United States.  The present case, in contrast, involves an <u>authorized</u> sale made pursuant to a license under a United States patent.  <u>Boesch</u> does not speak to this issue.

The <u>Fuji Photo</u> court also noted that the "United States patent system does not provide for extraterritorial effect."  394 F.3d at 1368.  But in patent cases -- including the cases cited in <u>Fuji Photo</u> itself -- the concept of "extraterritorial effect" refers to imposing liability under United States law for conduct occurring outside the United States.  <u>See, e.g.</u>, <u>Microsoft Corp. v. AT & T Corp.</u>, 550 U.S. 437, 127 S. Ct. 1746, 1751-52 (2007); <u>Deepsouth Packing Co. v. Laitram Corp.</u>, 406 U.S. 518, 531 (1972); <u>Brown v. Duchesne</u>, 60 U.S. 183, 195 (1856);  <u>Int'l Rectifier Corp. v. Samsung Elecs. Co.</u>, 361 F.3d 1355, 1360 (Fed. Cir. 2004); <u>Rotec Indus., Inc. v. Mitsubishi Corp.</u>, 215 F.3d 1246, 1251 (Fed. Cir. 2000).  Holding that exhaustion is triggered by the authorized foreign sale of a patented product does not impose liability of this sort, and thus does not amount to giving extraterritorial effect to the patent law.

The Court therefore concludes that <u>Quanta</u>'s holding -- that exhaustion is triggered by the authorized sale of an article that substantially embodies a patent -- applies to authorized foreign sales as well as authorized sales in the United States.

19

**United States District Court**
For the Northern District of California

III. Location of the Relevant Sales

The Federal Circuit noted in _Quanta_ (_sub nom_ _Bizcom_) that there were two sales at issue in that case: "First, prior to this litigation, LGE granted Intel a license covering its entire portfolio of patents on computer systems and components.  This transaction constitutes a sale for exhaustion purposes.  See _United States v. Masonite Corp._, 316 U.S. 265, 278 (1942).  Second, with LGE's authorization, Intel sold its microprocessors and chipsets to each defendant."  _Bizcom_, 453 F.3d at 1370.  Although the Federal Circuit was reversed, the Supreme Court's decision did not address the issue of whether the license grant constituted a sale for exhaustion purposes.  While the decision repeatedly refers to the authorized sale as the sale of the licensed Intel products to the computer manufacturers, there was no need for the Court to distinguish between the two sales identified by the Federal Circuit, and nothing in the Court's decision suggests that it disapproved of the Federal Circuit's holding in this regard.

Moreover, the Federal Circuit's decision that the license transaction represented an authorized sale of the patented method finds support in _Masonite_, the Supreme Court case it cited.  In that case, the Court explained that exhaustion depends on "whether or not there has been such a disposition of the article that it may fairly be said that the patentee has received his reward for the use of the article."  316 U.S. at 278.  LGE received its reward for the use of its patented methods, in the form of a payment and a cross-license, when it entered into the license agreement with Intel.  And although _Masonite_ referred to the patentee's reward for

20

United States District Court
For the Northern District of California

1  the use of a patented "article," <u>Masonite</u>'s focus was on the

2  patentee's "reward" for possessing the monopoly rights that

3  accompany a patent.  Here, the reward occurred when LGE licensed

4  its patents to Intel; it did not receive a reward when the articles

5  that embodied those patents were sold from LGE to Intel.  The

6  license agreement was governed by New York law, and LGE appears to

7  concede that the license grant, to the extent it may be considered

8  a sale, took place in the United States.

9      In short, although LGE disagrees with the Federal Circuit's

10  holding that the license agreement represented a sale for

11  exhaustion purposes, this holding remains good law and is binding

12  on this Court.  Accordingly, even if the exhaustion doctrine

13  expressed in <u>Quanta</u> applies only to first sales in the United

14  States, LGE exhausted its rights with respect to the Hitachi

15  products at issue here because the first authorized sale under the

16  patents-in-suit occurred within the United States.

17                            CONCLUSION

18      For the foregoing reasons, Hitachi's motion for partial

19  summary judgment (Docket No. 81) is GRANTED.

20      IT IS SO ORDERED.

21

22  Dated: 3/13/09

                              _____
23                            CLAUDIA WILKEN
                              United States District Judge

24

25

26

27

28                                21